<pre>
                    UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,.    Case No. 2:20-cr-00251-HB-1
                            .
          Plaintiff,        .
                            .   U.S. Courthouse
      v.                    .   601 Market Street
                            .   Philadelphia, PA
NICHOLAS JAMES FUCHS,        .
                            .   January 16, 2024
          Defendant.        .
. . . . . . . . . . . . . . .   1:55 p.m.

                 TRANSCRIPT OF SENTENCING HEARING
               BEFORE HONORABLE HARVEY BARTLE, III
                UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:        MARY E. CRAWLEY, ESQ.
                          UNITED STATES ATTORNEY'S OFFICE
                          615 Chestnut Street, Suite 1250
                          Philadelphia, PA  19106
                          mary.crawley2@usdoj.gov
                          (215) 861-8519


For the Defendant:        JESSICA NATALI, ESQ.
                          GREENBERG TRAURIG
                          1717 Arch Street, Suite 400
                          Philadelphia, PA  19103
                          (215) 988-7824
                          natalij@gtlaw.com


Audio Operator:           NICOLE SPICER

TRANSCRIBED BY:           VALORI WEBER
                          Weber Reporting Corporation
                          PO Box 510376
                          Milwaukee, WI  53203
                          (970) 405-3643


               Proceedings recorded by electronic sound
          recording, transcript produced by transcription service.
</pre>

1                          PROCEEDINGS

2              THE COURT:  Good afternoon, you may be seated.

3              GROUP COLLECTIVELY:  Good afternoon, Your Honor.

4              THE COURT:  The Court has before it this

5    afternoon the sentencing in the case of the United States

6    of America versus Nicholas James Fuchs, criminal action

7    number 20-251.

8              Mr. Murray or Ms. Crawley, are you going to be

9    speaking for the Government?

10             MS. CRAWLEY:  Yes, Your Honor.

11             THE COURT:  Hear from you first, and then I'll

12   hear from Ms. Natali and then the defendant.

13             MS. CRAWLEY:  Yes, Your Honor.

14             THE COURT:  You may proceed.

15             MS. CRAWLEY:  The Government is impressed by the

16   amount of support that Mr. Fuchs has, and we are also

17   impressed with other aspects of his activity in the case,

18   both positively and negatively, Your Honor.  And so what

19   I'd like to do is just to distinguish between his role in

20   the offense on the one hand and the sterling cooperation

21   that he provided.

22             Now, as the Court is aware, the guidelines are

23   the starting point, the base offense level is a 26.  There

24   is a new adjustment for zero history points, defendant like

25   Mr. Fuchs, under 4(C)1.1, he is accepted responsibility,

1   which makes his total offense level 21.  With a criminal

2   history category of one that means that he has a sentencing

3   guideline range of 37 to 46 months.

4          Now, one area of dispute between the parties is

5   whether Mr. Fuchs has -- is deserving of a mitigating role.

6   And the Government's response on that is no, we do oppose

7   that, whether it is phrased as a variance or as Counsel had

8   put it earlier in her objections to the pre-sentence

9   report, as a request for a guidelines downward adjustment.

10  We don't believe it's appropriate.

11         As the Court has learned at trial and as we have

12  said at previous sentencings, this is not a case in which

13  the Government believes there was a hierarchy.  We believe

14  that each of the defendants in this case played a critical

15  role.  No one could have done this alone, but that's the

16  whole point.  They work together to do what they tried to

17  do, that is to export sanctioned Iranian oil to China and

18  to sell it there for profit, to make a business out of that

19  activity, Your Honor, in violation of the international

20  export -- excuse me -- the International Emergency Economic

21  Powers Act.  And this is, as the Government has stressed, a

22  very serious crime.  But everyone was needed.  Everyone

23  played their part.

24         Mr. Fuchs asks for downward variance, and hadn't

25  before asked for a downward adjustment.  But this was a

1   group of people, Your Honor, who came together, in large

2   part because of Mr. Fuchs in order to make millions of

3   dollars over months, if not years, by helping the

4   Government and the country of Iran, an enemy of the United

5   States.

6           Now, Mr. Fuch's role was crucial.  He had learned

7   from his -- someone he knew in up in the Northeast, that

8   is, he didn't know J.M, but he did know his partner, Nick

9   Hovan.  And Nick Hovan's partner, J.M., had learned a

10  source of sanctioned oil.  He reached out to Mr. Hovan, and

11  Mr. Hovan in turn reached out to Mr. Fuchs.

12          As the Court will recall from the trial,

13  Mr. Fuchs had been taught by Mr. Hovan's brother when he,

14  Mr. Fuchs was at boarding school.  The brother had worked

15  there so that Mr. Hovan was looking for potential buyers

16  and then Mr. Fuchs was a possible source.

17          Now, Mr. Fuchs was working for Stack Royalties,

18  the mineral rights company, and he used his connections

19  there.  He made the most of those.  He introduced -- at the

20  end of July of 2019, he introduced Hal Mason to one of his

21  co-workers, Mr. Thwaites.  Mr. Thwaites, in turn brought in

22  Mr. Wang.  And this was after Mr. Fuchs had learned at the

23  end of July of 2019 that the sanctioned oil would be coming

24  from Iran.

25          He introduced Mr. Mason also to his boss.  That

1   is Dan Lane at stack royalties.

2          Now, because the meeting in New York that was

3   attended by Mr. Hovan, J.M. and Ravi, who was actually an

4   FBI undercover agent, and Hal Mason because that went so

5   poorly, it was a question of whether or not these people

6   who the defendants did not know were undercover operatives.

7          Mr. Hovan reached out to Mr. Fuchs to see whether

8   they should still come down to Dallas.  And Mr. Fuchs said,

9   yes, they should.  If he was only making introductions, he

10  would not have done this.  He could have at that point

11  walked away and done nothing further.  And that's not what

12  he did.  He remained involved.

13         And so because that meeting went so poorly, as

14  the Court heard about at trial, Mr. Fuchs had a separate

15  meeting with the -- with Ravi and with Hal Mason in Dallas

16  when he came down -- when the two came down on the 18th of

17  September 2019.

18         Now, at that meeting, which was just Mr. Fuchs

19  and these two individuals whom he believed were the source

20  of the Iranian oil, he learned in excruciating detail about

21  how badly this meeting in New York went, and from

22  Government's Exhibit 1-4, the undercover agent told

23  Mr. Fuchs about the New York meeting.

24         We walk in.  He's like sanctioned oil, you can go

25  to jail for that.  You can't -- you can't do that.  All the

1   money will be taken.  And it was like a very, very

2   uncomfortable meeting.  And the agent said further to

3   Mr. Fuchs, I walked into that meeting and literally told an

4   almost stranger that we're planning to commit something

5   that could send us to jail.

6        Now, Mr. Fuchs heard this, he was not deterred.

7   He said, I'm well aware of all the implications of that.

8   And he agreed to speak with his boss, Dan Lane, at -- and

9   make sure that Dan Lane was in fact had some interest in

10  oil that would be sanctioned oil from Iran.  And then Mr.

11  Fuchs had a second meeting the next night with Ravi, with

12  Hal, and with his boss Dan lane.

13       So as the Court knows from the trial, the

14  September meetings were very significant.  They were

15  critical to the case going on.  And at the meetings that

16  were had, first the one with Mr. Fuchs by himself, then the

17  one with Mr. Wang and Mr. Thwaites the next afternoon.  And

18  then another meeting with Mr. Fuchs and Mr. Lane the next

19  night, they all agreed on most of the major aspects of this

20  deal.  And the critical introductions that Mr. Fuchs was

21  making here are by themselves enough that -- to show that

22  Mr. Fuchs was not a minor or a minimal participant in the

23  case -- in the deal, rather, but he did remain involved and

24  he communicated throughout the fall and the winter with his

25  co-schemers.  He wasn't just checking up on how things were

1   going, he did more than that.

2          He reached out to Ravi, the undercover agent, and

3   he suggested additional buyers for the sanctioned Iranian

4   oil.  He was all in, and he participated in the meeting

5   that I mentioned with Dan Lane at Stack Royalties, and was

6   in communication later about the possible Panamanian buyer

7   that Dan Lane initially was bringing to the table.

8          He didn't just make introductions and then step

9   back, Your Honor.  He participated in discussions about

10  securing financing for the deal.  And he participated in

11  discussions about laundering the Iranian's funds, the

12  proceeds that they would receive from selling the

13  sanctioned oil through -- and that was something with Dan

14  Lane, and that was through the purchase of Stack Royalties

15  mineral rights.

16         And Mr. Fuchs also discussed through encrypted

17  WhatsApp messages and phone calls, obtaining offshore

18  accounts and Antiguan passports, he himself formed a shell

19  corporation through which he could hide his proceeds from

20  the scheme.  So he remained engaged throughout, Your Honor.

21         And he participated in a number of the various

22  encrypted WhatsApp chains.  And he had telephone calls with

23  Mr. Hovan. which were of course not recorded, but those

24  still happened.  He was keeping Mr. Hovan in the loop.

25         And he himself, Mr. Fuchs, formed an entity to

1    receive his laundered proceeds, and he negotiated for a

2    percentage of the profit.  He was not just getting money

3    from the front end, he was getting money from Mr. Lane as

4    well on the additional laundering that was part of the

5    greater scheme that would be done through the sale of the

6    mineral rights, which is --

7              THE COURT:  He's not been charged with money

8    laundering.

9              MS. CRAWLEY:  He did not.  And to his credit, he

10   was not charged because he came in earlier, which is a

11   separate issue --

12             THE COURT:  Right.

13             MS. CRAWLEY:  -- and he did admit, as the Court

14   heard, that he did engage in the money laundering and that

15   is to his credit.

16             He did -- he attended the meeting finally with

17   the other participants, and he was traveling from Dallas.

18   He signed a fraudulent contract between his new shell

19   company and the Mr. Thwaites' Swiss entity so that he could

20   receive his proceeds on the front end.  And then this was

21   obviously in order to conceal the fact that the people

22   involved were receiving proceeds from an illegal deal.

23             And he knew that Mr. Thwaites and Mr. Wang would

24   be picking up Antiguan passports.  The idea was they would

25   get Antiguan passports to help with this laundering.  He

1   was aware of that.

2          And then at the meeting, which the Court heard

3   portions of at the trial, he did -- Mr. Fuchs explained his

4   contribution to the deal and then everyone was arrested.

5          So that we believe that based upon the definition

6   of what is a mitigating role and the various things that

7   are involved here with Mr. Fuchs, as a minor participant,

8   he would have to be less culpable than others.  As a

9   minimal participant, he would be -- have to be among the

10  least culpable.  But when the Court assesses Mr. Fuchs'

11  knowledge and his involvement and his culpability, we

12  believe that a fair resolution of that issue is that he was

13  an average participant.  He understood the scope and the

14  structure of the criminal activity.  He -- and these are

15  the factors that apply under the guidelines and whether

16  this is phrased as a guidelines issue or a variance, we

17  believe that the analysis should be the same.

18         He participated to a significant degree in

19  planning and organizing the criminal activity to the extent

20  anyone did since it was in fact an undercover activity --

21  excuse me -- an undercover case and that this was something

22  that thank goodness for our national security, there was no

23  actual sanctioned Iranian oil to be obtained here.

24         He did exercise decision-making authority to the

25  same extent that anyone else did who were the defendants in

1   the case.  And he was -- had an extensive role in keeping

2   this group together.  He went to get buyers to begin with.

3   And then he kept the group together, because as one person

4   put it, he was the linchpin of the group; that is, with Dan

5   Lane on the one side, and the other people who were

6   involved more on the front end of this conspiracy on the

7   other.

8          And he did stand to benefit to a significant

9   degree from the criminal activity.  It is his burden to

10  bear to come forward with evidence to show that, and we

11  believe that he has not done so, so that we believe that

12  all of the factors here show that a mitigating role is not

13  warranted.

14         And there are several requests for downward

15  variances that are in addition to this mitigating role

16  question.

17         Should I address those at this time, Your Honor?

18         THE COURT:  Whatever you'd like.

19         MS. CRAWLEY:  Yes, Your Honor.

20         The argument has been made that sentencing

21  disparity would result if this Court were to impose a

22  custodial sentencing -- sentence here.

23         Now, despite the significance of Mr. Fuchs'

24  cooperation, which we will discuss in a moment, we don't

25  believe that that is so.  We are seeking a sentence of

 1    incarceration in this case.

 2          Sentencing disparity refers to disparity between

 3    this defendant and persons across the United States in

 4    cases of this type.  As Counsel correctly points out, there

 5    aren't that many cases of this type.  But the -- what we

 6    believe the court -- the Third Circuit meant in the *Lacerda*

 7    case, which we put -- that has been cited in our papers --

 8    we believe that the Third Circuit made a wise decision in

 9    that case to say that it is on the defendant to show that

10    if he believes that he is entitled or should receive the

11    same sentence of someone else in a different case, he

12    should show that his situation is parallel to theirs.  And

13    I submit that Mr. Fuchs, his able counsel has not found

14    such a case.  And it -- sentencing disparity also has to do

15    with really, it's not just against one case.  This is not a

16    race to the top or a race to the bottom of one judge does

17    something and then everyone else has to do the same thing.

18    That's what the guidelines are for.

19          And so for those reasons, Your Honor, we believe

20    that there would not be sentencing disparity caused should

21    this Court impose a custodial sentence.

22          Counsel points out that this is a non-violent

23    crime.  That is in the nature of this sort of crime, so we

24    don't believe that a variance is justified on that basis.

25          Counsel relies on application note 2 to Section

1     2M 5.1 of the Sentencing Guidelines.  We don't believe that

2     that is appropriate.  It is not -- it is not the case.

3     Counsel seems to suggest that the security interests of the

4     United States, our national security interests, are not

5     harmed when a case of this type is brought when -- because

6     there wasn't any sanctioned Iranian oil, so no harm, no

7     foul.  That is not correct.  We believe that he -- clearly

8     these people could have caused a great deal more harm had

9     there been Iranian oil for them to sell.  But the executive

10    branch has decided --

11          THE COURT:  Iranian oil for them to buy.

12          MS. CRAWLEY:  I'm sorry, for them -- well, for

13    them to sell, having bought it from the Iranians, they

14    believed, and then sold it to the Chinese.  I stand

15    corrected.

16          But essentially, the national security interest

17    of our country that is harmed by persons believing that

18    they can get together and make a business out of this.  And

19    so we believe that this is just another packaging of the

20    argument that it's an undercover case, no harm, no foul.

21          We strongly disagree.  We believe that it is

22    appropriate, if not imperative, to prevent our citizens

23    from helping the enemies of our country.  And that cases

24    like this serve that function and that this -- so that

25    therefore application note tw2o does not assist Mr. Fuchs

1  in this case.

2         We can -- the Government does have a motion, Your

3  Honor.

4         THE COURT:  Go ahead.

5         MS. CRAWLEY:  Okay.  Now, I am -- as I said at

6  the beginning, I think it's important to distinguish

7  between Mr. Fuchs' role in the offense and his cooperation.

8         His role in the offense was essentially just as

9  important as anyone else's.  He was more or less an average

10  participant.  But his cooperation is another story.  His

11  cooperation was sterling.  He came in immediately.  He was

12  talking to the agents the day of his arrest.  And he -- out

13  of all of the persons who said anything that day, he was

14  certainly the most truthful.

15         He has not wavered since that time.  And I have

16  to say, this was a -- this was very helpful to the

17  Government.  His cooperation was truthful, it was timely,

18  and it was substantial.  We do still believe because of the

19  nature of the offense and it's -- the -- how serious it is

20  and how important deterrence, especially general deterrence

21  is in this case, that we are still seeking a sentence of

22  incarceration after the Court takes into account the

23  admirable and extensive cooperation of the defendant.

24         Thank you.

25         THE COURT:  Ms. Natali.

1           MS. NATALI:  Certainly, Your Honor.

2           I'd like to first start with where Ms. Crawley

3    ended, if that's all right with the Court with regard to

4    the motion, Your Honor.

5           THE COURT:  Absolutely.

6           MS. NATALI:  Yes.  We submitted to the Court,

7    albeit just this morning or last night, a chart that we

8    thought would be helpful to the Court.  Just, --

9           THE COURT:  Yeah, I've read it.

10          MS. NATALI:  Yeah, just to illustrate in a

11   helpful visual way for the Court to really compare the

12   different cooperators in this case.  And so we just -- I

13   just want to -- we appreciate and we agree with the way the

14   Government has highlighted my client's cooperation.  We

15   agree with that.  He was a model cooperator over the last

16   four years.  He did everything the Government asked of him.

17   Upon arrest, he consented the search of his cellphone

18   immediately.

19          And in stark contrast to the other defendants,

20   one of those defendants litigated a motion to suppress

21   before Judge Brody.  Several agents had to testify.  There

22   was briefing on both sides.  There was an opinion written

23   by Judge Brody.  And it wasn't until after Mr. Hovan

24   reviewed all the discovery, filed all his motions,

25   litigated, and wasted the Government and the Court's time

1   and realized that he was losing, and then learned that my

2   client was going to be cooperating against him, then

3   Mr. Hogan decided that he was going to cooperate, in stark

4   contrast with my client, Your Honor.  That is quite the

5   record for a cooperator to put the Government to its test

6   and fight with the Government is really quite remarkable.

7           And so that was the reason for the charge.  It

8   was years later that Mr. Thwaits and Mr. Hovan saw the

9   light of day that my client saw the day that he was

10  arrested and met with the agents and consented to the

11  search of his phone instead of litigating over his phone.

12          And it was within days that we went to the U.S.

13  Attorney's Office, albeit with different prosecutors with

14  AUSA Jennifer Williams and Michael Rinaldi, and with these

15  agents where we went through his phone and he provided a

16  roadmap of his phone with hundreds of WhatsApp messages,

17  and call logs, and text messages, and documents, and

18  contracts, and everything that was on his phone, even

19  before the Government had had the opportunity to fully like

20  digest what was on that phone, he was going over it with

21  them and helped them build their case.  Because recall,

22  Your Honor, this case began with a complaint and warrant,

23  so this was before the indictment.  This defendant helped

24  the Government build its case and testified in the grand

25  jury before seeing any discovery and without any fight

1    against the government.

2           His cooperation led to convince Mr. Hovan and

3    Mr. Thwaites to plead guilty.  His testimony, as Your Honor

4    knows at trial, was quite lengthy and helped to convict

5    Mr. Lane and Mr. Wang.  And we submit that this was a

6    completely different case without my client.  From the

7    beginning until the end, it was a different case without

8    his cooperation.

9           There were -- then I mentioned in my memo several

10   attempts to intimidate my client.  All of those attempts

11   were reported to the FBI.  Both involved people, suspicious

12   folks going to residences where he wants -- one of them he

13   formally resided and another one where he did reside, a

14   gentleman waited in his lobby, and he contacted law

15   enforcement at that time.  And that --he still didn't

16   waver.  As the government said he never wavered with any of

17   his cooperation.

18          And so we submitted that chart just to show you

19   all the different docket entries.  There were 500 docket

20   entries on Mr. Hovan and Mr. Thwaites' docket that we

21   reviewed and compare.  And you could see from the chart how

22   different, how our client really is in stark contrast.  And

23   we submit that we'd like the Government to note and the

24   Court -- Your Honor to note and take that into account when

25   considering the extent of the departure for the 5k.

1          And with that, I'd like to continue at this time
2     with the rest of my presentation with regard to the
3     different variances.
4          And I'd also, Your Honor, just like to note the
5     folks that are in the courtroom, and we have a couple
6     folks, short comments by them.
7          THE COURT:  You may.
8          MS. NATALI:  Okay.  So I'd like to start with
9     that before my argument.
10         THE COURT:  Whatever you want.
11         MS. NATALI:  Okay.  So as I call your name, I
12    just like -- would like folks to stand in the courtroom
13    supporting my client or my client's mother and Sutherland
14    Fuchs; his brother, Slater Fuchs and his brother's wife,
15    Ellen Fuchs.  And we have a family friend, Mr. Tim Berry.
16    We also have my client's girlfriend, Kelly Donahue.
17    They're all here in support.  They've all submitted
18    letters, Your Honor.
19         And if the Court accepts, I'd like to have my
20    client's mother come up to the podium and make a brief
21    statement now.
22         THE COURT:  Ms. Spicer, will you please swear in
23    the witness.
24    ///
25                    ANN SULLIVAN FUCHS,

1  a witness, having been first duly sworn, was examined and

2  testified as follows:

3          THE CLERK:  Please state your name for the

4  record.

5          MS. FUCHS:  Ann Sullivan Fuchs.

6          THE CLERK:  Thank you.

7          THE COURT:  Good afternoon.

8              DIRECT EXAMINATION (NARRATIVE)

9          MS. FUCHS:  Your Honor, I'm extremely grateful

10  and humbled to be allowed to speak to you on behalf of my

11  son Nicholas James Fuchs.

12          As I thought about today, I'm both saddened by

13  the offense that my son committed, but also confident in a

14  bright future for an exceptional young man that made an

15  enormous mistake.

16          I adopted Nicki when he was two weeks old with my

17  husband, Jim Fuchs.  And he was our dream son that we'd

18  been trying to have for many, many years.

19          One year later we adopted Nicky's biological

20  brother, Slater.  They both attended the Buckley School in

21  New York.  Nicky then went off to Berkshire, a boarding

22  school in Sheffield, Massachusetts.  Sadly, tragically, the

23  boys lost their father at that time.  And then they both

24  attended Southern Methodist University in Dallas, Texas,

25  where they were roommates.

1        Jim and I raised Nicki and Slater in New York

2   City.  They attended Buckley, as I mentioned, a rigid and

3   academically challenging school that provoked an advanced

4   level of thinking and instilled a high standard of ethics

5   and morals in each student.  Jim and I sought to emphasize

6   those standards, same standards at home.

7        Nicki then attended boarding school and displayed

8   an innate ability to make friends and excel at living on

9   his own while still being a teenager.  Nicki was outgoing

10  and curious when in our home with close friends or his

11  brother, but he was surprisingly very shy in the classroom.

12  I was always taken aback when I visited him in his

13  elementary school or high school with his very quiet, never

14  raising his hand demeanor.

15        Outside of the house, Nicky seem to lack

16  confidence while trying to gain others approval.  From a

17  very early age, he was always concerned with what he was

18  going to do professionally.  If there was one thing he didn

19  know, it was that he wanted to succeed at whatever he

20  pursued, and doing so earn the respect of those around him,

21  which would in turn, of course, increase the self-

22  confidence.

23        When he pursued his first job after graduation

24  without my help, he was excited just to get the job

25  interview.  He was then thrilled that he'd actually landed

1    a job.  At that time, he was enthusiastic, energetic, and
2    totally inexperienced.

3              Having said all this, Your Honor, there is no
4    excuse for my son's actions.  But I believe that, like me,
5    you may recognize a pattern from the time he was a young
6    boy to his adult life.  He was a young man who hadn't had a
7    tremendous amount of confidence throughout his life.  He
8    was in his first job out of college trying to gain some
9    financial independence and be successful.  Unfortunately,
10   then my son made some truly regretful decisions.

11             I have had the unique perspective of being able
12   to listen and watch my son from the time he was arrested to
13   this hour before his sentencing.  From the time he was
14   arrested, his remorse for his actions was immediate.  He
15   knew what he had done was wrong and was profoundly ashamed,
16   incredulous that he could committed an offense that was so
17   reprehensible.  It was extremely difficult for him to be
18   with me, his brother, or his friends.  His anger at himself
19   has been overwhelming.  Regret and shame continuously run
20   through his veins.

21             My son has been tortured by deep self-
22   condemnation, with a thought that he could commit such an
23   offense.  He has been even more tortured by seeing what his
24   actions have done to those around him who he loves the
25   most.

1          Having been raised with such strong moral and

2    ethical values, the idea of committing an offense like this

3    screams regret and shame through his veins every day and

4    every night.

5          Importantly, I believe it's one's reactions to

6    adversity, the reaction to adversity, not adversity itself,

7    that determines how one's life story will develop.

8          After his arrest, he moved out of Texas, got away

9    from the oil and gas business, and worked with some small

10   startup companies in the roofing business, trying to

11   develop an expertise that would be valued by others and

12   contribute to society in a positive way.  He tried to turn

13   his life around and enter therapy which continues today.

14         For close to four years, while almost paralyzed

15   by shame, regret and dishonor, he has been totally focused

16   on trying to make up for such a wrong.  I believe that my

17   son is now leading a life of purpose, has done an admirable

18   job of picking up the pieces to lead a life of dignity and

19   honor.

20         Nicki has learned the hard way.  He wants nothing

21   more than for his family to look at him with respect and

22   honor and he's begun to walk down that road one day, one

23   hour at a time.

24         Finally, I think the thing that's haunted him the

25   most is that he did anything against the United States of

```
 1  America.  My son has had the opportunity to travel and see
 2  how extremely fortunate he is to be an American and live in
 3  the United States.  He has shown deep remorse and regret/
 4          As his mother, I can assure you, Your Honor,
 5  Nicki has learned his lesson and I know would never do
 6  anything ever to even remotely commit any possible offense
 7  at all ever again.
 8          Your Honor, I humbly ask for your leniency for my
 9  son.  Thank you for allowing me this time.
10          THE COURT:  Thank you for coming.
11          MS. NATALI:  Tim Barry.
12          THE COURT:  Ms. Spicer, would you please swear in
13  the witness.
14                      TIMOTHY F. BARRY,
15  a witness, having been first duly sworn, was examined and
16  testified as follows:
17          THE CLERK:  Would you please state your name for
18  the record.
19          THE WITNESS:  Timothy F. Barry.
20          THE CLERK:  Thank you.
21          THE COURT:  Good afternoon.
22                    DIRECT EXAMINATION
23  BY MS. NATALI:
24     Q   Mr. Barry, could you just please explain to the
25  Court a little bit about your background and who you are,
```

1   how you know my client.

2       A    Your Honor, I'm a friend of the Fuchs family.

3   I've known them since approximately 1998.  At that time, I

4   was employed as a lieutenant colonel, the number two

5   position in the Connecticut State Police.  Their father,

6   Jim Fuchs, reached out to me as he was in charge of the

7   charity program that provides college scholarships to

8   children of police officers and firefighters that are

9   killed in the tri-state area in the line of duty and

10  provides college scholarships to them.

11          He wrote a letter to me.  We subsequently met.

12  We actually played around a golf a couple of weeks later,

13  and we became fast friends, and I got to know the family

14  very well, and his family got to know me very well.

15      Q    And when was that?

16      A    That was 1998.  At that point, Nicholas Hughes

17  was about five years old.

18      Q    And can you just tell us a little bit about your

19  family,  where you're from and your background?

20      A    I actually come from a family of law enforcement

21  officers.  I have -- my parents had six sons.  Five of the

22  six were law enforcement officers, including the FBI; the

23  New York City Police Department; Nassau County, New York;

24  Rochester, New York; Greece Police Department.  I worked

25  for the Connecticut State Police.  And I did have one

 1    brother that we refer to as the only success in the family,
 2    Your Honor, not being involved in law enforcement.
 3            I also have several nephews that are involved in
 4    law enforcement with the Georgia State Patrol, and other
 5    agencies as well.  So I come from a family of law
 6    enforcement officials that are dedicated to public service.
 7        Q    And can you tell the Court your relationship with
 8    my client?
 9        A    Yes.  Actually, over the years, we've had a lot
10    of events together.  We've gone to sporting events
11    together.  At the time back then when the boys were
12    teenagers, their father was older, and the boys would have,
13    for example, sleepovers with their schools at a mountain
14    resort in Connecticut.  And I would go in and I was
15    actually, by their father, named their honorary Godfather,
16    they refer to me both -- both boys refer to me as Uncle
17    Tim.  I've known them, as I said, for the last 20 something
18    years.
19            And we'd have sleepovers.  We went to ballgames
20    together.  I was at their house for meals.  They were at my
21    house for meals.  They would come -- I had Jet tickets.  I
22    probably shouldn't say that in Philadelphia, but --
23            THE COURT:  That's all right.
24        A    -- I was a Jet season ticket holder for 10 years,
25    and they came to games with me.  I went to Yankee games

1  with them.  We went through a lot of different events

2  together and the families were close, and we got to know

3  each other very well.

4      Q    And lastly, can you just share with the Court

5  your thoughts about any insight that you believe is

6  relevant to the proceedings today?

7      A    Yes.  Your Honor, I have to say that I agree that

8  what he did was reprehensible.  That is completely out of

9  character for him.  I was actually stunned when I got the

10  call, and I'm not a person that's easily shocked.

11          But I think with some certainty that much that a

12  human being can, I think I'm a good judge of character, I

13  don't believe that Nicholas Fuchs will ever, ever offend

14  anyone.  He'll never offend again.  And he'll never repeat

15  any type of crime in his life.  And I'm absolutely certain

16  of that.

17          He has learned his lesson.  He has been punished.

18  And he carries that stigma of a felony conviction with him

19  the rest of his life.  And I believe firmly that the days

20  of his mistakes are over.

21          THE COURT:  Thank you.  Thank you very much for

22  coming.

23          THE WITNESS:  Thank you, Your Honor.

24          MS. NATALI:  Your Honor, my client does intend to

25  allocute.  Would you --

1          THE COURT:  Well, I think we need to hear from

2     you about all these departures and variances you're

3     seeking.

4          MS. NATALI:  Certainly, Your Honor.  I just

5     wanted to let you know that he will do that.

6          THE COURT:  Well, that certainly be helpful.

7          MS. NATALI:  Okay.  I will address the 3553(a)

8     factors, various arguments.  I'm sure the Court has read

9     the memo we submitted and the many --

10          THE COURT:  I've read your memo, the Government's

11     memo, and all the papers that have been submitted, all the

12     letters, psychological report, Dr. Atkins.

13          MS. NATALI:  Yes.  So I will summarize now the

14     arguments regarding the 3553(a) factors, as well as my

15     various arguments.  And I will also comment on some of what

16     Ms. Crawley has already spoken about today.

17          THE COURT:  Are you making any departure motions?

18          MS. NATALI:  No, Your Honor, we are not.

19          THE COURT:  Okay, just variance.

20          MS. NATALI:  Just various arguments.

21          THE COURT:  All right, thank you.

22          MS. NATALI:  Yes, certainly, Your Honor.

23          We submitted lengthy objections and we have no

24     further objections to the pre-sentence investigation

25     report.  No departures arguments at this point.

1           THE COURT:  All right, go ahead.

2           MS. NATALI:  I'd like to first start with the

3   history and characteristics of my client and focus the

4   Court's attention on my client's youth, as the Court must

5   view the conduct in this case and the context of the point

6   in his life when this occurred.

7           He was in his mid twenties, no criminal record.

8   Aand his youth and lack of criminal history are essential

9   factors for this Court to consider.

10          All of the letters highlight some themes that he

11  was sensitive, that he is compassionate, that he was a

12  people pleaser, and somewhat insecure.  And that also bears

13  out and Dr. Atkins' report.  You know, you heard from

14  Nicki's mother and you have her letter.  You know, he was

15  quiet, sensitive, insecure and trying to please others.

16          You also had the letter from his biological

17  brother, Slater, because they were both adopted.  And his

18  letter was quite remarkable and commented on his compassion

19  and how he was the best friend and the best brother that

20  anyone could have had.

21          You heard from Nicki's girlfriend, Kelly, and you

22  saw the pictures, and how she commented how compassionate

23  and dedicated a person he is, and how she marvels at how he

24  is with her young daughter.  And you can imagine, Your

25  Honor, that she wouldn't -- she wouldn't want to have

1    someone driving her daughter to school every day and around

2    her daughter if she didn't really have the highest regard

3    for this young man.  He's serving as a father figure in her

4    daughter's life.

5            And you heard from the former colonel commanding

6    officer of the Connecticut State Police and state troopers

7    just now about what a good man he is and how he believes

8    that he learned his lesson.  And the many, many other

9    letters that I won't go through, where they talked about

10   how -- what a genuine loyal person he is, and how he always

11   was seeking to please others, many times to a fault, Your

12   Honor.

13           And many Courts have considered the defendant's

14   age as a factor in sentencing below the guideline range and

15   allowing for a variance.

16           In his mid twenties, he was still navigating his

17   transition from college to his first job without the

18   assistance of a father figure, a father in his life.  He

19   was the youngest of all the defendants in this case.  And I

20   just want to point that out to the Court, that he was the

21   youngest person who was operating in the scheme.

22           He was adopted by his parents, and unfortunately,

23   his father died in a particularly formative and vulnerable

24   time in his life.  He not only lost his father, but he lost

25   someone who was a role model and really a hero to him.

1           And this really had a dramatic impact on his

2    life.  He began using drugs and alcohol to dull the pain of

3    that, the loss of his father.  And, you know, as noted in

4    Dr. Atkins' report that was quite a problem for him. And he

5    struggled with that for a long time.  As he sits here in

6    court today, I, myself have personally watched this young

7    man mature over the last four years, and he is not the same

8    person as he sits here today that he was back in 2019 and

9    2020.

10           He does not abuse alcohol and marijuana.  He is

11    in therapy.  He is going weekly to AA meetings.  He has

12    sought to improve himself.  But at the time of this

13    offense, he was in his mid twenties.  He's now --

14           You're 30, right?

15           THE DEFENDANT:  Yeah.

16           MS. NATALI:  He's now 30, Your Honor.  And so

17    he's had time, and he's had really remarkable post-offense

18    rehabilitation, Your Honor.

19           And Your Honor mentioned that the report of

20    Dr. Atkins. and I will just highlight that was Exhibit 8 in

21    my filings, all the different factors that went into his

22    report.  And based on his evaluation and to a reasonable

23    degree of certainty, he met the diagnostic criteria for

24    social anxiety disorder, mix personality disorder with

25    dependent and avoidant features, alcohol use, cannabis use

1  disorder.  And he also comes close to me and diagnostic

2  criteria for autistic spectrum disorder.

3           He showed immaturity, naivete, deficits in self-

4  confidence, dependency, feelings of inferiority and

5  inadequacy, social anxiety, disorder, submission,

6  submissiveness, excessive need for reassurance, feelings of

7  helplessness, fear, being anxious about how he's going to

8  be able to fit in in the world, being driven to succeed and

9  his fear of not succeeding and loneliness.

10          And, quite significantly, I noted in the pre-

11 sentence investigation report at paragraph 70, the symptoms

12 of these conditions have challenged him throughout his life

13 and has substantially contributed to his offense related

14 choices and decisions.

15          And with all of that, his age, and his

16 characteristics that I've described, that is part of our

17 argument for variance in this case.

18          The Government didn't comment on Dr. Atkins'

19 report, or his his deficits, or the different diagnostic

20 criteria that Dr. Atkins mentioned, or the fact that he was

21 adopted, or the fact that his father died when he was a

22 teenager, or the fact that he had alcohol use disorder, or

23 marijuana use disorder.  All of that was absent from the

24 Government's memorandum and so that's why I want to make

25 sure to point all of these things out to the Court with

1  regard to a variance because I did not see that in the

2  Government's memo and I did not see -- hear that today from

3  Ms. Crawley in her remarks.

4      All of that is mitigation and grounds for a

5  variance.  A defendant this young with no criminal record

6  and with such significant cooperation, there are many, many

7  cases that talk about disparate treatment in sentencing,

8  disparate sentencing, in a case like that with the

9  defendant this young with no criminal record, this type of

10 extraordinary cooperation, as I applaud the Government has

11 noted in court today in its filing, it is warranted for a

12 variance.  And, in fact, someone in his shoes and another

13 part of this country would easily get a variance in

14 sentencing.  And that's -- that's what should be considered

15 in terms of unwarranted sentencing disparities, especially

16 in a case where it was an attempt, and we do not in any way

17 disagree with the Government that this was an extremely

18 serious offense.

19      However, the fact remains that it was an attempt

20 and it was an undercover case.  So it was not a case where

21 there was a victim.  There is no victim in this case.

22 There's no mention of that in the case whatsoever.  There's

23 no restitution being ordered, which is a sentencing factor.

24      In terms of his post-offense rehabilitation, he

25 is in weekly therapy.  He goes to AA meetings weekly.  He

1    moved away from Texas away from the oil and gas business to
2    be close to his mother.  He worked different jobs.  He's
3    now started his own business.  He is in a healthy
4    relationship.  And he's had nearly perfect pretrial
5    supervision.  All of that goes towards post-offense
6    rehabilitation, Your Honor, and a variance is warranted on
7    that alone.
8            When you look at the nature and circumstances of
9    the offense, while the crimes were undoubtedly serious,
10   they were non-violent, and he was not motivated, and
11   there's no evidence or any suggestion by anything other
12   financial.  This was a financial crime.  It was motivated
13   by getting financial independence.  This was not a crime
14   that anyone has suggested was motivated by some malicious
15   desire to benefit the enemy of the United States, or any
16   desire to hurt the United States.  It was about financial
17   independence.  It's a financial crime in a case where there
18   is no victim.
19           And so in order to address the variance under
20   2M 5.1, I would just -- I don't disagree with much of what
21   Ms. Crawley stated on that, just that the entire scheme was
22   facilitated by undercover agents.  It was not a
23   sophisticated scheme, and that the volume, an effect on
24   commerce was less than minimal, which is one of the
25   factors, Your Honor.  Here it was not.  There was no oil.

1   That there was no real scheme.  It was really quite a sort
2   of poorly written screenplay.  It wasn't very
3   sophisticated.  At best, it was an attempt that never --
4   that never came to fruition.

5          In terms of minor role, Your Honor, the
6   Government spent a lot of time on that.  And I don't
7   disagree with much of what the Government has said about
8   minor role.  The PSR notes that it with regard to this at
9   paragraph 40, that this might be appropriately addressed as
10  a possible basis for a downward variance.  And so we are
11  not seeking to have the Court make findings on a departure,
12  especially post Booker.

13         We're asking for the Court to just consider some
14  variance, consider the totality of what this young man did.
15  He was not the mastermind of the scheme.  There is no
16  evidence to suggest that he came up with this idea
17  whatsoever.  He didn't devise the scheme.  He didn't come
18  up with the scheme.

19         It was introduced to him by Mr. Hovan who was the
20  one who was fighting with the Government and who decided to
21  plead and cooperate almost two years after my client.  He
22  brought the scheme to my client.  He was giving the
23  directions.  My client was not involved, or did understand
24  -- even understand the ways to mix and disguise the oil.
25  It was not, you know, developed and understanding, you

1     know, how you would disguise the origin of oil.  He didn't
2     -- he wasn't involved in that.

3            He also didn't understand how to draft any of the
4     paperwork.  Yes, he signed it, that is correct, but he
5     didn't draft it, because he was not the mastermind behind
6     this thing.

7            He really attended all the meetings.  I agree
8     with the Government.  He was there.  He was necessary.  He
9     was the one who was introducing everybody and facilitating
10    everybody.

11           But our argument is not that he wasn't there.
12    Our argument is that in the implementation of the scheme,
13    he was not directing, and he was not in charge.  He was not
14    knowledgeable enough to do that.

15           And there were meetings where it was important
16    for him to be there, and he was there phone, and phone
17    calls as well.  And he was, as the Government said,
18    reaching out and trying to make the scheme happen.  He was
19    doing that.  But his role was not such that he had a core
20    role in implementing the scheme.

21           In fact, there were meetings where he did almost
22    nothing.  And we -- as examples of that, because there's so
23    many phone calls in these, we have Exhibit 26 and Exhibit
24    27 that we gave the Court as exemplars of that where he did
25    almost nothing at those meanings.  Pages and pages and

1   pages of the transcript.  And he was saying and doing

2   nothing.  He was just sitting there.  And our argument is

3   that he had a minor role in the implementation of the

4   scheme.  After he introduced folks, at those meanings, he

5   had a minor role.

6          In fact, in Exhibit 27, the undercover agent,

7   actually forgot that he was on the phone call and they

8   joked and laughed about it.  Oh, right.  Oh, Nicki's here.

9   And so -- and that was because our argument is that while

10  he did make the introduction, and while he was a willing

11  participant, he was less involved and did not mastermind

12  the scheme, or really have a significant role in the

13  implementation of the scheme.

14          With regard to general deterrence, Your Honor, we

15  submit that this case must be viewed differently than any

16  normal case because of the significance of his cooperation,

17  Your Honor.  Because when you talk about deterrence and you

18  talk about what the public finds out when crimes are

19  committed, a young defendant with no criminal record who

20  immediately begins to cooperate -- as Ms. Crawley, I

21  believe she said his cooperation was sterling -- sterling

22  cooperation must be encouraged.

23          And so our position is that the general details

24  analysis must be viewed in a different way in this case,

25  because of the extraordinary sterling cooperation of my

1    client.

2              And a sentence outside the advisory guideline

3    range and a variance is warranted in this case, given his

4    youth, his lack of prior criminal history, his acceptance

5    of responsibility, and his efforts to really reform his

6    life.

7              The new zero point offender amendment, which the

8    probation department correctly found that he was eligible

9    for, has an application note that is also the basis for a

10   variance.  A departure including a departure to the sense

11   other than a sentence of imprisonment may be appropriate if

12   the defendant received an adjustment under the zero point

13   offender, which he did.

14             And the defendant's applicable guideline range

15   overstates the gravity of the offense, because the offense

16   is a conviction, is a non-violent crime, or it's otherwise

17   -- an otherwise serious offense.  So I would like to focus

18   because the offense of conviction, by its nature, as the

19   Government remarks, is a non-violent crime.

20             And so we submit that that application note

21   provides this Court with the basis for a variance with

22   regard to the need for avoiding sentencing disparities, as

23   I mentioned earlier, a young defendant with no prior record

24   who cooperates to the extent that he did and has such

25   extraordinary post-offense rehabilitation with his going to

1  therapy to understand why he did this, with him trying to
2  go to AA meetings, getting a sponsor.  You received a
3  letter from his sponsor, Your Honor, that spoke to his
4  dedication for sobriety.
5           And you'll recall from the trial and from the
6  transcripts, all of the defendants in this case were
7  drinking very heavily during this case.  And now he stands
8  before you today with a sponsor, going to AA meetings,
9  going to therapy, trying to understand and search for why
10 this happened and turned his life around.
11          Nicki's case is anything but average.  His
12 personal history and characteristics and his extraordinary
13 cooperation weigh in favor of a variance in this case.
14          And with that, Your Honor, that's a summary of
15 the variance arguments.  I let you know that he intends to
16 allocute.  And I put a sentencing request in my memo.  If
17 you would like me to outline that now or after he
18 allocates.
19          THE COURT:  Whatever you wish to say.
20          MS. NATALI:  Okay.  So --
21          THE COURT:  It's time to do it.
22          MS. NATALI:  -- the Defense is respectfully
23 requesting a sentence for Mr. Fuchs of one day, credit for
24 time served, because as Your Honor is aware, he did spend a
25 couple of nights in the Philadelphia Federal Detention

1   Center, which was very dramatic and had quite the impact on

2   my client.  So one day credit for time served, followed by

3   three years of supervised relief, with whatever conditions

4   the Court deems appropriate.

5          In looking at all the facts, the 3553(a) factors,

6   the defendants significant cooperation, as stated by the

7   Government, a sterling, the Government's 5K motion, all of

8   the various arguments, especially his youth, and the

9   factors set forth, and Dr. Atkins' report, and included in

10  the pre-sentence investigation report about his diagnostic

11  impressions, leading him to conclude that the conditions

12  have challenged him throughout his life and contributed to

13  his actions in this case, we submit that our recommended

14  sentence is sufficient, but not greater than necessary in

15  this case.

16         And if Your Honor is not inclined to order a

17  sentence in line with our request, I would just like to

18  make the Court aware, whatever conditions the Court deems

19  is appropriate, the Court could consider ordering as a

20  condition of release the first portion of it to be served

21  on home confinement.

22         And as Your Honor knows, the Third Circuit has

23  recognized that home confinement is considered

24  imprisonment, which would be in line with the Government's

25  recommendation that he gets some period of imprisonment.

1  And it's also considered punishment by the Third Circuit

2  and by many courts, including many in this district,

3  because it's a serious restriction on the defendant's

4  liberty.

5          And with that, that summarizes my arguments, Your

6  Honor.

7          THE COURT:  Before we hear from Mr. Fuchs, Ms.

8  Crawley, do you wish to make any further remarks?

9          MS. CRAWLEY:  Very briefly, Your Honor.

10         There are many good things to say about

11 Mr. Fuchs, but I believe his counsel goes too far.  I think

12 -- I would like to be able to stand here and only sing his

13 praises, but this was a very serious offense, and it was

14 near treasonous.

15         As to the chart that Counsel had given the Court,

16 we could quibble around the edges about what other people

17 did.  Mr. Hovan did in fact consent to search of his phone,

18 even though he wished he hadn't and tried to take it back.

19         But the Government, while we're very appreciative

20 of Mr. Fuchs' cooperation, we hesitate to say anything that

21 would throw shade on a person exercising their

22 constitutional rights.  At the end of the day, we don't

23 really want to compare him.  What we want to say is what he

24 did and why that was good.

25         As to the variances.  We have all faced in our

1  lives difficulties, problems.  And here, this was a crime

2  of greed.  There was absolutely no financial need for

3  Mr. Fuchs to do this.  And it is not worthy of a variance

4  in the Government's view that Mr. Fuchs does wish to seek

5  out the reasons why he did this later.  That is admirable.

6  That is good.  And he has certainly done what the

7  Government asked him to do on that side.

8          But as I said before, we're asking the Court to

9  distinguish between his cooperation on the one hand and the

10  seriousness of the offense and the need for deterrence and

11  to promote respect for the law in this most heinous of

12  cases that the Court has before it.

13          And we thank you for your patience, Your Honor.

14          THE COURT:  Ms. Spicer, would you please swear in

15  the defendant.

16                  NICHOLAS JAMES FUCHS,

17  the Defendant, having been first duly sworn, was examined

18  and testified as follows:

19          THE CLERK:  Please state your name for the

20  record?.

21          THE DEFENDANT:  Nicholas James Fuchs.

22          THE CLERK:  Thank you.

23          THE COURT:  Mr. Fuchs, before you make your

24  allocution. I want to ask you if you've read the pre-

25  sentence report.

1               THE DEFENDANT:  Yes, Your Honor, I did.

2               THE COURT:  Have you discussed it with your

3     attorney?

4               THE COURT:  Yes, Your Honor.

5               THE DEFENDANT:  Do you have any objections to

6     anything contained in that report?

7               THE DEFENDANT:  No, I do not. Your Honor.

8               THE COURT:  This is now your opportunity to

9     address the Court to advise me if anything you think I

10    should know about you and your circumstances before I

11    determine what sentence to impose.

12              THE DEFENDANT:  Thank you, Your Honor.

13              Your Honor, I greatly appreciate the opportunity

14    to speak to you today.  I want to first start by thanking

15    the Federal Bureau of Investigation, as well as the United

16    States Attorney's Office of the Eastern District of

17    Pennsylvania.  In particular, I would like to thank special

18    agents Vicanti and Torno of the FBI, as well as current and

19    former Assistant U.S. Attorneys who worked on this case

20    Jennifer Williams, Michael Rinaldi, Patrick Murray, and

21    Mary Crawley, for their dedicated work and understanding

22    over the last four years, because they've always treated me

23    with the utmost respect and dignity.  And I greatly

24    appreciate that.

25              I also want to thank the people who are here

1   supporting me the courtroom today:  my mother; my brother,

2   Slater; his wife Ellen; Tim Barry, Uncle Tim; and Kelly, my

3   girlfriend and future wife.  Thank you for coming today to

4   support me through this process.

5            First and foremost, I accept responsibility for

6   unlawful actions.  I have no excuses for them.  But I want

7   to let you know, Your Honor, how my actions have impacted

8   me since my arrest.

9            Since my arrest nearly four years ago, I have

10  come to truly understand the magnitude of my actions.  I

11  lost sight of the values my parents instilled in me.  My

12  actions were motivated by my desire for financial

13  independence.  Excuse me.  And it led me to committing

14  crimes against the United States.

15           The two nights I spent in the Philadelphia

16  Federal Detention Center were terrible.  They were the

17  worst lowest moments of my life.  When I sat in that cell

18  and learned some very hard lessons.  At that point, I knew

19  I wanted to work hard to turn my life around.  I'm deeply

20  ashamed at what I did, and even worse, I'm sad that I did

21  this to my mother and my entire family and how it has

22  impacted them.

23           My father passed away when I was 16 and I miss

24  him every day.  But I'm glad he's not here to see this.  My

25  father was a patriot and loved this country.  He would have

1  been devastated at what I did.  It deeply saddens me that

2  my actions are a stain on his legacy.

3          It felt good to work with Special Agents Vicanti

4  and Special Agent Toron to cooperate.  I felt like I was

5  helping my country, restoring the values that my family had

6  instilled in me, and hopefully making my family proud that

7  I was now doing the right thing and turning my life around.

8          Every day since my arrest, I felt like I have a

9  tattoo on my forehead that says felon, screw up ,or less

10 that.  This has had error vocal repercussions not only on

11 my day-to-day life and business, but also on my most

12 intimate and personal relationships, including with those

13 in the courtroom today.

14         For example, it has been hard for me to even be

15 around my mother because I know how hard this has been for

16 her.

17         Even now meeting people for the first time, I'm

18 afraid to tell them too much about myself or even tell them

19 my last name for fear that they can Google me and find out

20 about what I did.  I'm ashamed and it's embarrassing.  But

21 I have been taking steps to work through these issues and

22 become a better person, a very different person than I was

23 back in 2019.

24         During the last four years, I've worked to

25 restart my life, including mending relationships with

1   family.  I attend AA meetings and have been for the last

2   three years.  I go to therapy once a week.  I'm focused on

3   my new business and being a good son, brother, and

4   boyfriend, and caring for my future stepdaughter.  I want

5   to be a role model like my father was to me.

6          Your Honor, I want you to know that I've learned

7   my lesson, and I will never, ever do anything to violate

8   the law ever again.  I am deeply remorseful for what I've

9   done.  And again, I appreciate Your Honor taking the time

10  today to listen to my statement.

11          THE COURT:  Thank you very much.  You may return

12  to your seat.

13          THE DEFENDANT:  Thank you, Your Honor.

14          THE COURT:  Mr. Fuchs, you have pleaded guilty in

15  this court you conspiracy to violate the International

16  Emergency Economic Powers Act.  And you have pleaded guilty

17  to engaging and attempting to engage in transactions

18  prohibited by the International Emergency Economic Powers

19  Act.

20          The Court must first calculate your sentence

21  under the advisory sentencing guidelines.  The base offense

22  level in this case is 26.  You are what we call a zero

23  point offender, which permits me to depart downward to

24  levels come to level 24.

25          I find you have accepted responsibility for your

1    conduct, and I therefore depart down for three for more
2    levels for a total offense level of 21.
3         You have no criminal history points for criminal
4    history category one.  Under the advisory sentencing
5    guidelines, you could be sentenced to between 37 and 46
6    months in prison.  The Government, as you have heard, has
7    filed a motion under Section 5K 1.1 of the advisory
8    sentencing guidelines, which permits me to depart downward
9    based on substantial assistance.
10        I have reviewed, of course, all the criteria
11   under Section 5K 1.1.  You satisfy those criteria, and the
12   Government's motion under Section 5K 1.1 of the guidelines
13   will be granted.
14        before determining what your sentence should be,
15   I must take into account the various relevant factors under
16   Title 18, United States Code section 3553A and fashion a
17   sentence which IS sufficient but not greater than
18   necessary.
19        The factors which I should consider are the
20   nature and circumstances of the offenses and the history
21   and characteristics of you, the defendant; the seriousness
22   of the offenses; the need to promote respect for the law;
23   the need to provide a just punishment for the offenses; the
24   need to afford adequate deterrence to criminal conduct; the
25   need to protect the public from further crimes of you, the

1    defendant; and, of course, the need to avoid unwarranted

2    sentencing disparities among defendants with similar

3    records who have been found guilty of similar conduct.

4              First, Mr. Fuchs, I want to start with the

5    seriousness of the offenses.

6              There's absolutely no question that the offenses

7    which you've committed were some of the gravest offenses

8    under the Federal Criminal Code.  What you were doing, in

9    essence, was to buy sanctions of Iranian oil and attempted

10   to buy sanctions of Iranian oil and to sell it to China.

11             In essence, oou conspired to undermine

12   significant foreign policy of the United States of America,

13   to contain Iran, a terrorist state, which is seeking to

14   undermine the safety and security of most of the world.

15             In order to carry out its goals, Iran needs

16   money.  And where does it obtain money?  By selling its

17   oil?  The foreign policy of the United States is designed

18   to thwart those sales.  You and your co-conspirators, in

19   attempting to buy Iranian oil, engaged not in a short-term

20   conspiracy.  What is so troubling here is that your goal

21   was long-term, not just to buy one shipload of oil, but to

22   continue to buy shipload after shipload over a number of

23   years.  And your aim was to make millions of dollars.

24             I want to now turn to the issue of deterrence,

25   which has been raised here in this courtroom today.

1          I have absolutely no doubt that you will never

2     again be a defendant in a federal criminal matter.  But the

3     Court has to be concerned about deterring others similar to

4     yourself and your co-conspirators who have the idea that

5     they can profit from the sale of sanctioned Iranian oil.

6          You were consumed by greed and other people

7     unfortunately are consumed by greed.  So the Court has to

8     take that into consideration in determining what sentence

9     to impose.

10         The Court also needs to note the factor involving

11    respect for the law.  Civilized society can only exist if

12    people live by the rules.  And the rules apply to everyone,

13    no matter what that person's station and life may be.

14         A lot has been said here about your history and

15    characteristics.  As I've said earlier, I've read the pre-

16    sentence report.  I've read the report of Dr. Atkins.  I've

17    read every letter that's been submitted on your behalf.

18    And, of course, I've listened intently to the statements

19    that your mother made here in the courtroom, and Mr. Barry

20    made here in the courtroom.  And I was particularly

21    impressed by many of the letters that were written, again,

22    by your mother, especially, and your brother, and your

23    fiancée.

24         There's a lot of talk here today about your

25    youth.  And while that is certainly a factor I take into

1    consideration, clearly what you did was not some petty,
2    youthful transaction -- transgression.

3           The Court also, as we mentioned earlier, must
4    consider your substantial cooperation.  I presided over the
5    trial where you testified.  Yu testified forcefully and
6    credibly.  And quite rightly, you cooperated.  And, of
7    course, the Court is indebted to you for what you've done
8    in that regard.

9           The Court, however, must weigh on the one hand
10   your substantial cooperation, your sincere remorse, the
11   fact that you will never again be in this court, as far as
12   I can tell, with the very grave crime you committed.  You
13   may not have realized that at the time, but it was a grave
14   mistake and grave crime indeed.

15          Under the totality of the circumstances,
16   Mr. Fuchs, I'm going to commit you into the custody of the
17   Attorney General of the United States for a period of
18   imprisonment of ten months, to be followed by two years of
19   supervised release.

20          I order you to pay a fine of $3,000 within 30
21   days.

22          And that 10-month sentence will apply to both
23   counts, the sentence to run concurrently, and two years of
24   supervised release will run concurrently on each count.

25          I want you to pay immediately a special

1    assessment of $200.

2         I advise you of your right to appeal your

3    sentence to the United States Court of Appeals for the

4    Third Circuit to the extent you have not waived your right

5    to appeal.  Any notice of appeal must be filed within 14

6    days after I sign the judgment and commitment order.

7         If you wish a notice of appeal to be entered, you

8    may indicate that to the deputy clerk here in the courtroom

9    and she will enter a notice of appeal on your behalf.  As I

10   said, a notice of appeal must be filed within 14 days after

11   I sign the judgment and commitment order.

12        I order you to self-surrender on March 11, 2024.

13        I will sign the various orders that have been

14   presented to me in terms of sealing and impoundment.

15        Anything further from the Government.

16        MS. CRAWLEY:  Nothing further, Your Honor.

17        THE COURT:  Ms. Natali, anything further?

18        MS. NATALI:  We would recommend -- we would like

19   to request that we recommend to the Bureau of Prisons that

20   he'd be designated to the appropriate facility closest to

21   his residence in Santa Barbara so that his family can visit

22   him.

23        THE COURT:  I will make that recommendation to

24   the Bureau of Prisons, although it's not binding, of

25   course, but I'd be happy to do that.

1          Anything further at this time?

2          MS. CRAWLEY:  No, Your Honor.

3          THE COURT:  Mr. Fuchs, this is a very sad day,

4   and unfortunately, your family is also been punished.  And

5   that's inevitable in these situations.  It's very sad

6   indeed.

7          After you serve your prison sentence, I hope you

8   will become a useful and productive citizen.  I have no

9   doubt that you will.

10          Thank you.

11          THE CLERK:  All rise.

12          (Proceedings concluded at 3:10 p.m.)

13                         * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T I O N**

2          I, Valori Weber, court approved transcriber,

3    certify that the foregoing is a correct transcript from

4    the official electronic sound recording of the

5    proceedings in the above-entitled matter, and to the

6    best of my ability.

7

8        /s/  *Valori Weber*

9    Valori Weber

10

11   Dated:   February 18, 2024

12

13

14

15

16

17

18

19

20

21

22

23

24